IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 4:12-CR-3062 |
| vs. | |
| DALE B. PETERSON, | SENTENCING MEMORANDUM |
| Defendant. | |

## BACKGROUND

The matter before the Court is the sentencing of defendant Dale B. Peterson. Pursuant to a plea agreement, Peterson pleaded guilty to an information charging him with bank fraud, in violation of 18 U.S.C. § 1344 (count 1), and conversion of property pledged as collateral to the Commodity Credit Corporation, in violation of 15 U.S.C. § 714m(c) (count 2). *See* filings 1, 6, and 7. The Court accepted Peterson's plea, but deferred acceptance of his plea agreement until sentencing. Filing 14. The Court accepted the plea agreement at an evidentiary hearing held on December 10, 2012. Filing 35.

The advisory Guidelines sentencing range for Peterson is tied to the amount of loss attributable to his *criminal* conduct, which the parties dispute. Also pending before the Court is Peterson's Motion for Variance. Filing 18. Finally, the government has requested that restitution be ordered. The Court has considered the parties' evidence and briefs, the revised presentence investigation report ("RPSR") prepared by the United States Probation Office, and the evidence and arguments adduced at the December 10, 2012 hearing and the January 14, 2013 sentencing hearing. *See* filings 35 and 36. For the reasons discussed below, the Court finds that Peterson should be held accountable for a lesser amount of loss than that urged by the government, but that his motion for a below-Guidelines sentence should be denied. The Court further finds that the government has not sufficiently shown what amount of loss caused to the victims should be attributed to Peterson, and an order of restitution is not warranted.

## FACTUAL BACKGROUND

Peterson was involved in the daily operations of Peterson Farms, Inc. (PFI), a cattle-feeding business located in Ord, Nebraska. RPSR ¶ 21. PFI

was owned and operated by Peterson's father, Bryan "Barney" Peterson (now deceased). RPSR ¶¶ 3, 38. PFI fed cattle belonging to the Lillie Foth Trust; Peterson's mother, Carolyn Peterson, was either the trustee or beneficiary of the Trust. RPSR ¶ 2. At all relevant times, Barney Peterson managed PFI and the Trust's cattle operations. RPSR ¶ 38. While Dale Peterson was responsible for day-to-day matters, the Court finds that his father controlled the cattle-feeding operations for the Trust and PFI, and was indisputably the real decision maker in managing Trust assets. RPSR ¶ 41.

In 2000, the Trust obtained loans (or lines of credit) from BankFirst, a bank based in Norfolk, Nebraska. RPSR ¶ 4, 38. The loans were renewed annually and secured by deeds of Trust and blanket agricultural security agreements covering livestock, feed and grain, crops, pasture, and farm equipment owned by the Trust. When secured collateral was sold, the proceeds were supposed to have been deposited into the Trust's checking account at the bank to pay down the outstanding loan balance, or used to cover operating expenses. During the relevant period, the limit on the loans was approximately $4,000,000. RPSR ¶ 41.

### I. Facts Underlying Count 1 (Bank Fraud)

By 2006, PFI's cattle operation was not doing well, and Barney responded by pursuing what Peterson has characterized as an "aggressive" business strategy. RPSR ¶¶ 38, 45. This did not work, and PFI suffered substantial losses from 2006 onward. *See,* filing 25-3 at 8–11; filing 25-4 at 6–9. As of September 2008, the Trust owed BankFirst $3,997,714.29 in principal, and $524,216.54 in interest. Filing 32-1. Around that same time, BankFirst began to have serious concerns about the status of its loans to the Trust. RPSR ¶ 26; filing 32-1.

On October 30, 2008, a Bank representative met with Peterson to visually inspect the Trust's cattle. RPSR ¶¶ 7, 26. When the inspector noticed that the cattle which supposedly belonging to the Trust bore another owner's brand, he questioned Peterson. RPSR ¶ 26. In response, Peterson presented a forged bill of sale and a false brand transfer which represented that 3,274 of the cattle observed by the bank representative belonged to the Trust. RPSR ¶¶ 7, 26. In fact, all of the Trust cattle had already been sold, without the bank's knowledge. RPSR ¶ 28. By making this false representation, Peterson committed bank fraud, in violation of 18 U.S.C. § 1344. But the deception was yet to be detected.

In December 2008, the Trust submitted a report to BankFirst stating that, as of October 2008, the Trust owned 3,695 head of cattle valued at $3,447,326. RPSR ¶ 8. Throughout early 2009, Peterson reassured BankFirst that the cattle would be sold and payments made to make the loan current.

- 2 -

RPSR ¶ 27. Finally, in April 2009, Peterson came clean. He met with BankFirst representatives and admitted that the Trust cattle had, in fact, already been sold and that he had forged the bill of sale and brand transfer he had presented to the bank's inspector. RPSR ¶ 28.

Once the fraud was detected, BankFirst took steps to recoup its losses. But after liquidating various assets of PFI and the Trust, a balance of approximately $2,467,500 in principal remained on the loans. Barney and Carolyn Peterson assigned their substantial life insurance policies to BankFirst; these are the bank's only remaining collateral on the loans. Filing 25-2 at ¶ 8. The Bank has been paying the premiums to keep these policies in effect, $116,123.76 per year, for a total to date of $360,978.10. Filing 32-1. As of March 1, 2012, the Trust owed BankFirst $3,020,303.42. Filing 25-2 at ¶ 9. The Bank has written off the interest of $524,216.54.

### II. Facts Underlying Count 2 (Conversion of Pledged Grain)

The Commodity Credit Corporation, through the Farm Service Agency, offers farm-stored commodity loans to farmers. RPSR ¶ 30. These loans are secured by liens on stored crops, which are typically stored in bins under the producers' control. As a producer makes payments on a loan, the Farm Service Agency releases the loan on the quantity of crops redeemed.

Peterson was a partner in CD&K Farms, a Nebraska partnership which was formed in order to participate in such federal programs. RPSR ¶ 40. In 2008, the Commodity Credit Corporation extended a loan to CD&K Farms, in the amount of $211,830.88. RPSR ¶ 32. The loan was secured by corn that CD&K had stored in bins, as set forth in a separate security agreement and "Farm Stored Loan Quantity Certification," both signed by Peterson on behalf of CD&K. RPSR ¶ 32.

In February 2009, corn was redeemed, reducing the balance of the loan. RPSR ¶ 32. After no other redemptions or payments were made, and after the loan matured in September 2009, the Farm Service Agency discovered that the bins supposedly holding the secured grain were empty (or contained other grain), and that Peterson had fed the secured grain to livestock owned by the Trust. RPSR ¶¶ 32, 40. In October 2009, the Farm Service Agency notified CD&K Farms that an unauthorized disposition of the grain had occurred. RPSR ¶ 33. After some delay, CD&K responded, and in June 2010, the loan was paid off in full. RPSR ¶¶ 33–34.

### ANALYSIS

The Court follows the sentencing framework set forth by the Supreme Court in *Gall v. United States,* 552 U.S. 38, 49–51 (2007). The first step is to calculate the defendant's advisory Guidelines sentencing range, which

provides "the starting point and the initial benchmark" for any sentence. *Id. at 49*. Next, the Court determines whether any traditional Guidelines departures are warranted. *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008). Finally, the Court considers whether to vary from the advisory Guidelines range based on the factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50; *United States v. VandeBrake*, 679 F.3d 1030, 1039 n.7 (8th Cir. 2012).

The Court does not presume that the Guidelines range is reasonable, but makes an individualized assessment based on the facts of each case. *Gall*, 552 U.S. at 50. If the Court determines that a variance is appropriate, it must consider the extent of the deviation and ensure that there is a correspondingly compelling justification. *Id.* Ultimately, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a)(2).

### I. Peterson's Advisory Guidelines Sentencing Range

The dispute in this case is the proper application of U.S.S.G. § 2B1.1.[1] Peterson's base offense level is 7, as he faces a maximum penalty of 20 years or more under the bank fraud count. *See,* § 2B1.1(a)(1); 18 U.S.C. § 1344. The Guidelines then provide for graduated increases in the defendant's offense level, tied to the amount of loss caused by the defendant. § 2B1.1(b)(1). The parties dispute the amount of loss properly attributable to Peterson.

In the plea agreement, the parties agreed to recommend that Peterson should be held responsible for a total loss of more than $2,500,000, but less than $7,000,000, for a total offense level of 25. Filing 7 at 6. This agreement was made pursuant to Fed. R. Crim. P. 11(c)(1)(B), and is not binding upon the Court. *United States v. Schiradelly*, 617 F.3d 979, 982 (8th Cir. 2010). And Peterson reserved the right to request additional downward adjustments. Filing 7 at 7. Peterson and the government acknowledge that further post-plea discovery has educated both parties with respect to the actual loss attributable to Peterson.

The government urges that the amount set forth in the plea agreement is correct, which would result in an 18-level increase under the Guidelines. § 2B1.1(b)(1)(J). Peterson argues that only the loss to the Commodity Credit Corporation is properly attributable to his criminal conduct, resulting in a 10-level increase. § 2B1.1(b)(1)(F). Having bound himself to the loss calculation

---

[1] The Court utilizes the 2011 version of the Sentencing Guidelines.

- 4 -

set forth in the plea agreement, Peterson has framed his argument as a request for a variance outside the Guidelines.[2]

The government has objected to Peterson's motion for variance, and to any effort by the Court to calculate a Guidelines sentence different from that recommended by the parties in their plea agreement. But as noted above, the plea agreement was made pursuant to Fed. R. Crim. P. 11(c)(1)(B), and is not binding upon the Court. *Schiradelly,* 617 F.3d at 982. A district court's mere acceptance of a plea agreement does not convert it into an 11(c)(1)(C) agreement, which is binding on the Court with respect to the sentencing recommendation. *United States v. Bennett,* 990 F.2d 998, 1004 (7th Cir. 1993); *see also, United States v. Lewis,* 633 F.3d 262, 270 (4th Cir. 2011); *Schiradelly,* 617 F.3d at 982. The plea agreement's sentencing recommendation was just that—a recommendation. *Schiradelly,* 617 F.3d at 982. The Court's acceptance of the plea agreement did not alter the type of agreement. *Bennett,* 990 F.2d at 1004; *see also Schiradelly,* 617 F.3d at 982. So, the Court is not required to embody the recommendations contained within the plea agreement into the final judgment and sentence. *Bennett,* 990 F.2d at 1004. This is true regardless of whether it is the defendant or the government who urges adoption of the recommendation. *See, e.g., United States v. Wagner,* 994 F.2d 1467, 1475–76 (10th Cir. 1993), *superseded by statute on other grounds as stated in United States v. Smith,* 433 F.3d 714 (10th Cir. 2006).

The Court is, in fact, obliged to make its own determination as to the amount of loss. *See United States v. Cain,* 134 F.3d 1345, 1348 (8th Cir. 1998). Although a stipulation as to the amount of loss in a plea agreement that is knowing and voluntary will generally govern, the stipulation does not (in the absence of a *binding* plea agreement) fix that amount as a matter of law. *United States v. Granik,* 386 F.3d 404, 411 (2d Cir. 2004). It is essentially a promise by the government and the defendant not to contest the stipulated amount and to represent to the court their joint view that the amount is accurate. *Id.* But the stipulation does not bind the sentencing court, and that court must find the loss amount as a fact at sentencing. *Id.* Such a finding must be based on the record as a whole, including the affirmation by the defendant of the accuracy of the plea agreement and any

---

[2] The Court acknowledges that the procedure followed in this case was somewhat unusual. The Court allowed this procedure because the parties appeared to be in good faith agreement that it was the most sensible course for the Court to take in making an accurate loss calculation, as facts were further developed post-plea. It has proven more complicated and less agreeable than expected, but the Court is satisfied that the parties had notice and the opportunity to be heard on all issues relevant to sentencing.

other evidence before the court. *Id.* In short, the Court is not bound by the parties' recommendation, and the Court will consider Peterson's arguments in making its own Guidelines calculation.[3]

For purposes of § 2B1.1(b), loss is calculated as the greater of the actual or intended loss. Actual loss is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 cmt. n.3(A)(i). And "reasonably foreseeable pecuniary harm" is further defined as that harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense. *Id.* cmt. n.3(A)(iii). Intended loss, by comparison, includes any "pecuniary harm that was intended to result from the offense," including harm that was "impossible or unlikely to occur." *Id.* cmt. n.3(A)(ii). If the actual or intended loss cannot reasonably be determined, the Court may use the gain to the defendant as an alternative measure of loss. *Id.* cmt. n.3(B). Ultimately, this Court needs to make a "reasonable estimate of the loss." *Id.* cmt. n.3(C); *United States v. Rice*, 699 F.3d 1043, 1049 (8th Cir. 2012).

Certain credits must also be factored into the loss calculation. The Court must deduct any money or the fair market value of property returned to the victim before the offense was detected. § 2B1.1 cmt. n.3(E)(i). The "time of detection" is the earlier of: the time when the offense was discovered by a victim or a government agency, or when the defendant knew or reasonably should have known that the offense was detected or about to be detected by either the victim or a government agency. *Id.* Another deduction is made in cases involving "collateral pledged or otherwise provided by the defendant" prior to the offense being detected. *Id.* cmt. n.3(E)(ii). The Court must subtract the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing. *Id.*

---

[3] None of this should come as a surprise to the government. At the hearing held December 10, 2012, Peterson's motion for variance was fully briefed, and both sides had a full opportunity to be heard regarding the Court's loss calculation. At that time, the government did not raise any objection to the manner in which Peterson has presented his argument. *See* filing 36 at 2:00–8:00, 1:12:00–1:13:00. Following the hearing, the government submitted an additional brief, and again raised no objection to the sentencing procedures. The parties understood that the Court would undertake a loss calculation in response to Peterson's motion for a variance. In the end, it makes no practical difference that the Court has done so under its own Guidelines loss calculation, instead of within Peterson's request for a variance. As the Court informed the parties at sentencing, it would have reached the same sentence for the same reasons, under the Guidelines or § 3553(a).

The government argues that in Peterson's case, the intended loss is the correct measurement, as it was higher than the actual loss. According to the government, the actual loss caused by Peterson was the balance of the loan less the amount BankFirst has been able to recover by the time of sentencing from the disposition of collateral. This comes to $2,467,517.87 (the principal remaining on the loan balance). This does not include the approximately $500,000 in interest that was written off by BankFirst. The intended loss, according to the government, amounted to $3,447,326: the value of the cattle that Peterson misrepresented as belonging to the Trust. The government argues that as a result of Peterson's actions, BankFirst was "under-collateralized by almost $3.5 million" on its loan. Filing 30 at 3. Peterson counters that the losses to BankFirst occurred prior to his misrepresentations in October 2008, and were the result of the Trust's management of the cattle business. RPSR ¶ 41. Peterson also claims that he did not intend to cause the bank to lose any money. Instead, when he presented the false bill of sale in October 2008, he was hoping to conceal the true financial status of PFI and the Trust, in order to buy the Trust time to begin paying back the loan. RPSR ¶¶ 43, 46.

The Court finds that the government has not shown a sufficient causal connection between Peterson's false statement and any losses (actual or intended) suffered by BankFirst. The government's proposed calculation of actual loss is based on the formula used in cases of fraudulently obtained loans. *See United States. v. Parish*, 565 F.3d 528, 535 (8th Cir. 2009). But this case does not involve loans obtained by fraud. When Peterson's misrepresentations occurred, the Trust had already obtained all the funds it was going to receive from BankFirst. The last money advance from the bank to the Trust occurred in August 2008. *See* filing 25-5 at 1–2. Thereafter, the bank did not extend any more credit on the loans.

Rather, this case more closely resembles *United States v. Wilson*, 980 F.2d 259, 260–61 (4th Cir. 1992), where the defendant legitimately obtained a loan for a business. The business did poorly, and several months into the venture, the defendant submitted a false financial statement to the lender, overstating the company's assets. The defendant was convicted of making a false statement to a financial institution (in violation of 18 U.S.C. § 1014). In making its loss calculation under the Guidelines, the district court used the entire amount of the outstanding loan as a starting point. The Fourth Circuit rejected this method, as it overstated the amount of loss properly tied to the defendant's criminal conduct:

> When the offense involves making a false statement, the inquiry to determine loss must focus on the amount of loss related to the

false statement. Critical to the resolution of this appeal is the fact that at the time the loan applications were made and approved, no offense had been committed. Thus, while business losses began to occur soon after the loans were made, these losses were not related, as far as the record before us reveals, to the criminal conduct. Rather, a false statement was filed approximately seven months after the loans were made. The task of the district court is to determine the amount of loss that is attributable to [the defendant's] criminal conduct. Thus, we hold that in the event a bank loan legitimately is obtained by one who subsequently submits a statement that is required in connection with the loan and that statement is false . . ., the loss under U.S.S.G. § 2F1.1 is the loss that can be attributed to the false statement.[4]

Wilson, 980 F.2d at 262; see also, United States v. Berheide, 421 F.3d 538, 540–42 (7th Cir. 2005) (similar holding); United States v. Copus, 110 F.3d 1529, 1535 (10th Cir. 1997) (adopting Wilson); cf. United States v. Sheahan, 31 F.3d 595, 600 (8th Cir. 1994) (citing Wilson with approval).[5]

Actual loss must result from the defendant's conduct, § 2B1.1 cmt. n.3(A)(i), but the government has not shown any loss that *resulted from* Peterson's criminal conduct. Peterson kept the bank from learning the true financial status of PFI and the Trust for several months—and it is this conduct for which Peterson will be punished. But there is no evidence that Peterson's misrepresentation led to any additional losses, because there is no evidence that BankFirst would have been any better off but for Peterson's false statement. Perhaps if BankFirst had known earlier, it could have more effectively mitigated its losses. But the government has not offered any such proof. If Peterson knew that the bank's collateral was gone when he made the false statement—and he obviously did, or the statement would not have been false—then "'it is difficult to see how the bank was hurt by the delay' in collecting the collateral." Berheide, 421 F.3d at 541 (quoting United States v. Fearman, 297 F.3d 660, 661 (7th Cir. 2002)).

As the Tenth Circuit said in a factually similar case, the "crucial question is what [the bank] would have recovered had it foreclosed following the . . . inspection." Copus, 110 F.3d at 1535. In *Copus*, as in this case, a

---

[4] *Wilson* addressed the former guideline § 2F1.1, which was consolidated with § 2B1.1 in 2001. Its reasoning applies equally to this case.

[5] Although the present case involves a broader "scheme to defraud" under § 1344, the cases cited stand for the general proposition that loss must be caused by the defendant's criminal conduct.

debtor had obtained more time to repay a debt secured by a security interest in cattle, by representing cattle as his despite the fact that his cattle had already been sold. *See id.* The debtor had been buying and selling cattle for some time before the false representation was made, and investigators were unable to determine how many head of cattle the debtor had owned at various times before the fraud. *Id.* at 1533. The Tenth Circuit ultimately remanded the district court's judgment for a recalculation of the amount of loss (and the amount of the restitution award) because it was unclear how the defendant's false statement had contributed to the bank's loss. *Id.* at 1536. The Court explained that "if [the debtor] owned the cattle he showed [the bank], he made no misrepresentation; and if he did not, [the bank] could not have eliminated losses by foreclosing earlier." *Id.* at 1535.

The government's intended-loss calculation suffers from a similar causal defect. It is true that the bank was severely under-collateralized on its loans to the Trust. But the government has not proven that this resulted from Peterson's criminal conduct. By October 2008, the Trust had already maxed out its loans and PFI had sustained heavy losses. BankFirst was *already* under-collateralized; Peterson's actions simply kept the bank from learning of this for another 5 months, and Peterson will be punished for this act. Peterson claims that he intended to buy the Trust time to pay back the bank, and there is no evidence that Peterson intended to cause the bank additional losses. Peterson may have made his false statement based on "an unrealistic hope" of saving the business and paying back the bank, but it appears that he believed it possible. *See Berheide,* 421 F.3d at 541. In any event, there is no evidence to support a finding that Peterson intended the bank to lose any more than it had already effectively lost, given what Peterson knew about the condition of the Trust. *See id.*

When it became apparent that the Court was seriously weighing Peterson's argument regarding the loss calculation, the government began to rely more heavily on a different theory. Any loss calculation, the government argued, should reflect that Peterson caused BankFirst to be under-collateralized by selling cattle belonging to the Foth Trust, as this was all part of one overarching scheme to defraud the bank. Filing 39 at 1–2. But this theory was not the focus of the government's case in the plea agreement, at the plea hearing, or at the December 10, 2012 evidentiary hearing. *See*, filing 7 at 1–3; filing 13 at 27–29; filing 30 at 3, 6. Thus, there was little evidence presented to support that theory. It is undisputed that Trust cattle were sold without paying the bank. But based on the evidence before it, the Court cannot make a reasonable estimate of what amount of loss this caused the bank, nor what amount can be attributed to Peterson's criminal conduct.

The Court assumes, for the sake of argument, that Peterson should be held responsible for selling the cattle—as opposed to Barney Peterson, who managed and directed PFI and the Trust's cattle operations.[6] And the Court further assumes that the sales of such cattle were part of the same scheme to defraud BankFirst, and may be used to increase Peterson's offense level. Even so, too many questions remain: *how many* and *which* cattle were sold, *when* were they sold, and *how much* money was received that should have been paid to the bank?

Lacking such evidence, the Court cannot determine what amount of loss to BankFirst resulted from Peterson's criminal conduct, and what amount resulted from the Trust management's business decisions. If, for example, the Trust cattle fetched only $1,000,000, the Bank would still be out approximately $2,500,000, but that shortfall could not be attributed to any misconduct by Peterson. Similarly, because the Court does not know *when* any cattle were improperly sold, it is impossible to calculate what, if anything, should be included in the loss calculation. The burden is on the government to prove the factual basis for a sentencing enhancement by a preponderance of the evidence. *United States v. Peroceski,* 520 F.3d 886, 889 (8th Cir. 2008). Here, that burden has not been met, and any estimate of loss would be speculative, not reasonable.

In sum, Dale Peterson will be punished for the crimes that he committed, i.e., the misrepresentation and scheme to defraud BankFirst and converting corn pledged to the Commodity Credit Corporation, which caused both entities substantial harm, as outlined above. But Dale Peterson cannot be held criminally responsible for the entirely of a loan that went sour, as between BankFirst and the Trust. With respect to Peterson's individual criminal conduct, there has been no satisfactory proof of actual or intended loss as a measure of the harm caused to BankFirst. Nor has the government shown any gain by Peterson that could be used as an alternative measurement.

Thus, the loss that the government has proven was the approximately $178,000 loss to the Commodity Credit Corporation. Although the loan was repaid, the repayment only occurred after the offense was detected by the Farm Service Agency; thus the payment is not credited against the loss calculation. § 2B1.1 cmt. n.3(E)(i). Peterson has briefly argued that "payment from fat cattle [fed with the converted grain] used to pay off the loss is

---

[6] The record shows that Peterson knew Trust cattle were being sold; and he admitted selling the cattle during at least one of the April 2009 meetings with bank representatives and at his change of plea hearing. RPSR ¶¶ 28, 42; filing 36 at 44:30–46:00; filing 13 at 33–34.

payment from the 'disposition' of collateral." Filing 24 at 7. In other words, the grain was pledged as collateral; and although the grain was converted, it was used to feed cattle, which were in turn sold to pay back the loan. This argument is without merit. Peterson directs us to no caselaw supporting such a theory, and the record does not allow for "tracing" the grain to the ultimate payments made to the agency. Moreover, voluntary restitution occurring after an offense has been detected is not the same thing as posting collateral. *See United States v. Scott,* 74 F.3d 107, 112 (6th Cir. 1996).

A loss of $178,000 results in a loss level of more than $120,000 but less than $200,000 under § 2B1.1(b)(1)(F). This finding increases Peterson's base offense level by 10, to a level of 17. After 3 levels are deducted for acceptance of responsibility, Peterson's total offense level is 14. With a Criminal History Category of I, this places Peterson in Zone D, with a Guidelines sentencing range of 15 to 21 months' imprisonment. As there are no applicable departures, the Court next turns to the factors set forth in § 3553(a) to determine whether a Guidelines or non-Guidelines sentence is appropriate.

## II. Peterson's Motion for a Variance – Sentence

As noted earlier, the Sentencing Reform Act "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting § 3553(a)). This includes the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. § 3553(a). In determining an appropriate sentence, district courts must consider a number of factors, including: the nature and circumstances of the offense, the history and characteristics of the defendant, the sentencing range established by the Guidelines, any pertinent policy statement issued by the Sentencing Commission pursuant to its statutory authority, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a).

In a study of pre-Guidelines sentencing, the United States Sentencing Commission found that penalties for white-collar crimes such as fraud, embezzlement, and tax evasion were generally less severe, and even disproportionately low, when compared to penalties for "crimes such as larceny or theft, even when the crimes involved similar monetary loss." United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* vii, 15, 38 (Nov. 2004). And a large proportion of such white-collar offenders received simple probation. *Id.* at vii. In an effort to correct this under-punishment of white-collar crimes, the Commission drafted guidelines

- 11 -

to reduce the availability of probation and "to ensure a short but definite period of confinement for a larger percentage of these 'white collar' cases, both to ensure proportionate punishment and to achieve adequate deterrence." *Id.*

Although the Guidelines remain "the starting point and the initial benchmark" in determining a sentence, the district court "may not presume that the Guidelines range if reasonable," but must "make an individualized assessment based on the facts presented." *Gall,* 552 U.S. at 49–50. "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall,* 552 U.S. at 49–50.

The Court has done precisely that in the present case. At sentencing, Peterson argued for a sentence of 1 day of confinement, followed by a period of supervised release (to include home confinement). The government urged the Court to impose a sentence at the high end of the Guidelines. The Guidelines set forth a sentencing range of 15 to 21 months' imprisonment.

The Court finds that Peterson's motion for a variance or a sentence outside the Guidelines should be denied. In considering *all of* the sentencing factors set forth in § 3553(a), the Court finds that a sentence of 18 months' imprisonment, a $20,000 fine, and 150 hours of community service (upon release from prison) is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

With respect to the nature of the offense, the Court notes that the crimes at issue are undoubtedly serious offenses. There is an important public interest at stake in the ability of lenders to rely on the veracity of financial documents and bills of sale, and in the good faith of borrowers to provide truthful information and to secure pledged collateral. Dale Peterson's actions caused substantial harm to both BankFirst and the Commodity Credit Corporation. And in some ways, because of the unique set of facts, the Guidelines understate the harm done to the institutional victims in this case. Peterson directly lied to a BankFirst officer during a visual inspection of cattle. In representing that 3,274 of the cattle observed were, in fact, assets of the Trust, Peterson presented a forged bill of sale and a false brand transfer to dissuade the bank officer from worrying when the officer noticed that the cattle bore a brand other than the Trust's brand. As a result, the bank's security was at risk for several months and the bank's ability to effectively mitigate its loss was hampered. Peterson's deception was no small lie—he led BankFirst to believe that its loan was secured by approximately $3,500,000 worth of cattle, which would have secured most of the Trust's outstanding debt. And while Peterson eventually admitted the truth in April 2009, it was

only after he repeatedly deceived the bank over a period of several months, reassuring the bank that steps would be taken to pay down the loan. Peterson took advantage of his family's standing in the community and its relationship with BankFirst, and he betrayed the trust of the bank officer who handled the Trust's account, who had known the family for years. Filing 32-1 at 1; filing 36 at 15:00–16:00, 18:00–19:00. Peterson argued that he did not act out of a desire for personal gain, and was only trying to save his family's business. To some degree this is true, and that fact tempers his culpability slightly—but it should be noted that Peterson had his own stake in the family business.

The Court has also considered the history and characteristics of Peterson in fashioning this sentence. *See* § 3553(a)(1). Peterson has no criminal history, aside from one alcohol offense 38 years ago, and he appears to be a productive and respected citizen of Ord, Nebraska. He is employed, married, and is actively involved in the lives of his five adult daughters. In addition, Peterson plays a substantial caretaking role in the life of his (married) brother, Keith, who has been stricken with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease. Peterson has expressed remorse for his actions and the Court believes that his remorse is sincere.

Nonetheless, in formulating this sentence, the Court takes into consideration that this is the type of bank fraud and conversion case that fits squarely within the heartland of the Guidelines. The Court finds that a sentence that includes some period of incarceration is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and pursuant to the Guidelines, achieve some level of proportionality to blue-collar economic crimes such as theft and burglary. A sentence of 18 months' imprisonment is a significant sentence to a 58-year-old man who has never been incarcerated. A sentence that includes some period of imprisonment and a substantial fine, and not merely probation will promote respect for the law and, hopefully, afford a level of deterrence to similar criminal conduct. The Court notes that Peterson has already suffered serious consequences as a result of his crime. The family business is gone, and Peterson will suffer the stigma of a felony and loss of stature in a small community. The Court finds that the value of any additional prison time as a deterrent would be marginal—the Guidelines' appropriate goal of ensuring a relatively short but "definite period of confinement" is satisfied. Peterson is unlikely to reoffend, so this sentence is more than sufficient to protect the public from further crimes. This sentence also satisfies the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct in the District of Nebraska.

### III. Restitution

The Mandatory Victims Restitution Act, 18 U.S.C. § 3663 *et seq.,* requires defendants convicted of a crime "committed by fraud or deceit" to make restitution to the victims of the offense in the full amount of each victim's loss. 18 U.S.C. §§ 3663A(c)(1)(A)(ii), 3664(f)(1)(A). The government has the burden to demonstrate the amount of such loss by a preponderance of the evidence. § 3664(e). The statute defines a "victim" as "a person *directly and proximately* harmed as a *result* of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme." § 3663A(a)(2) (emphasis supplied).

Unlike the loss calculations under the Guidelines, which assess the defendant's culpability and are punitive in nature, restitution focuses on harm to the victim. *United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010). "The purpose of restitution is to put the *victim* back in the position he or she would have been but for the defendant's criminal conduct." *Id.* (emphasis in original). The amount of restitution cannot exceed the "actual, provable loss realized by the victims." *United States v. Martinez*, 690 F.3d 1083, 1088 (8th Cir. 2012). And the causal connection between the defendant's acts and the victim's losses must not be "unreasonably extended." *United States v. Spencer*, 700 F.3d 317, 323 (8th Cir. 2012).

As discussed above, the government has not shown a sufficient causal connection between Peterson's criminal conduct and losses realized by BankFirst. While the bank has suffered a significant loss as a result of funds advanced by the bank to the Trust prior to October 2008, there is not sufficient evidence to attribute those monetary losses to the criminal conduct of Peterson. *See, Copus*, 110 F.3d at 1537 (remanding for new restitution calculation where district court failed to determine which losses resulted from defendant's criminal conduct); *United States v. Diamond*, 969 F.3d 961, 966–67 (10th Cir. 1992) (for purposes of restitution, government bears burden to show that loss to lender resulted from criminal conduct, rather than borrower's insolvency). The original debt did not arise out of the conduct for which Peterson was convicted, and there is nothing to suggest that the loans were fraudulently obtained in the first place. A restitution award cannot be based on losses that would have occurred despite the bank's reliance on the false representation. *See Diamond*, 969 F.3d at 967. And assuming sales of secured cattle could form the basis for a potential restitution order, the government has not provided sufficient evidence to calculate such an award with any, let alone reasonable, certainty. The only other monetary loss—to the Commodity Credit Corporation and Farm Service Agency—has been paid

in full. Accordingly, the government's request for an order of restitution is denied.

A Judgment and Commitment and a Statement of Reasons in conformity with this Sentencing Memorandum will issue this date.

Dated this 15th day of January, 2013.

BY THE COURT:

*John M. Gerrard*
John M. Gerrard
United States District Judge